IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **RHEA M. WEISCHEDEL,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **Civil No. 11-809-CJP** |
| ) | |
| **MICHAEL J. ASTRUE**, ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Rhea M. Weischedel is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying her Disability Insurance Benefits (DIB), Supplemental Security Income (SSI) and Disabled Widow's Benefits (DWB).[1]

## Procedural History

Ms. Weischedel applied for benefits in October, 2008, alleging disability beginning on May 30, 2007. (Tr. 151, 155, 158). The application was denied initially and on reconsideration. After holding a hearing, ALJ William L. Hafer denied the application for benefits in a decision dated July 7, 2010. (Tr. 12-24). Plaintiff's request for review was denied by the Appeals Council, and the decision of the ALJ became the final agency decision. (Tr. 1).

Administrative remedies have been exhausted and a timely complaint was filed in this Court. Plaintiff filed a motion for summary judgment at Doc. 17.

---

[1]This case was referred to the undersigned for final disposition upon consent of the parties, pursuant to 28 U.S.C. §636(c). See, Doc. 9.

**Issues Raised by Plaintiff**

Plaintiff argues that the ALJ erred in the following respects:

1. He failed to consider all relevant evidence in determining plaintiff's residual functional capacity (RFC).

2. His credibility analysis was erroneous.

3. The decision was not supported by substantial evidence.

**Applicable Legal Standards**

To qualify for DIB, SSI or DWB, a claimant must be disabled within the meaning of the applicable statutes.[2] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).** A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C).** "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. **20 C.F.R. §§ 404.1572.**

---

[2]The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. For all intents and purposes relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. The regulations pertaining to DWB are found at 20 C.F.R. §§ 404.335 and 404.337. The definition of disability is the same for DIB. See, 20 C.F.R. § 404.335(c), incorporating the definition of disability set forth in the DIB regulations into the DWB regulation. Most citations herein are to the DIB regulations out of convenience.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. It must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. **Schroeter v. Sullivan, 977 F.2d 391, 393 (7th Cir. 1992); see also, 20 C.F.R. §§ 404.1520(b-f).**

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. The scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**. Thus, this Court must determine not whether Ms. Weischedel is, in fact, disabled, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. **See, Books v. Chater, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing *Diaz v. Chater*, **55 F.3d 300, 306 (7th Cir. 1995)**). This Court uses the Supreme Court's definition of substantial evidence, i.e, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." **Richardson v. Perales, 402 U.S. 389, 401 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. **Brewer v. Chater, 103 F.3d 1384, 1390 (7th Cir. 1997)**. However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, **597 F.3d 920, 921**

(7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

ALJ Hafer followed the five-step analytical framework described above. He determined that Ms. Weischedel had not been engaged in substantial gainful activity since the alleged onset date, and that she had severe impairments of chronic obstructive pulmonary disease, status post insect bite, migraine headaches and degenerative disc disease of the cervical spine. He found that plaintiff's alleged mental impairments were not severe, and he rejected her claim of disabling hand and finger pain. He determined that her impairments do not meet or equal a listed impairment.

The ALJ found that Ms. Weischedel had the residual functional capacity to perform a limited range of work at the medium exertional level. Based on the testimony of a vocational expert, the ALJ found that plaintiff has the capacity to perform her past relevant work of fast food worker, cashier, laundry worker, packer and housekeeper.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

1.   **Agency Forms**

Ms. Weischedel was born in June, 1953, and was about to turn 54 years old when she allegedly became disabled. (Tr. 151). She was last insured for DIB as of September 30, 2011, and the "prescribed period" for eligibility for DWB ended on November 30, 2011. (Tr. 174).

Plaintiff stopped working on May 30, 2007, due to breathing problems from COPD and problems with her left foot. She tried working at McDonald's for about a month after she

became disabled, but a spider bit her foot, causing it to swell, and she was "told not to come back." (Tr. 178).

Plaintiff had worked doing laundry and housekeeping at a nursing home and at a camping resort. She had also worked as a baby sitter, cashier, fast food worker and factory worker. (Tr. 179, 204). She completed the 11th grade and was in special education in several classes. (Tr. 183).

2.   **Evidentiary Hearing**

Plaintiff was represented by an attorney at the evidentiary hearing on March 24, 2010. (Tr. 15). The attorney stated at the outset that "one of the principal issues ... is the claimant's arthritic hands...." (Tr. 17).

Ms. Weischedel was 4' 11" and weighed 100 pounds. (Tr. 20). She testified that her fingers are swollen and painful. She drops things. Her right hand is worse than her left. She could not turn a doorknob with her right hand. She takes Tramadol for pain. (Tr. 22-24). She has difficulty breathing. She uses a Nebulizer machine for breathing treatments 4 times a day (Tr. 24-25).

Plaintiff was seeing a psychiatrist for depression. She had been depressed since her husband died 6 years earlier. She does not think of suicide. She cries twice a week. (Tr. 28-30). She did not start seeing a psychiatrist earlier because she did not have insurance. For some time, she did not go to a doctor. Rather, she would just go to the hospital if she needed medical care. She started going to a doctor in 2008 or 2009, when she got a medical card. Her doctor prescribed depression medication, but he told her to go to a psychiatrist because the medicine was not working. (Tr. 30-31).

She also has migraine headaches 3 or 4 times a week. They last 3 to 4 hours. She takes

medication for them. (Tr. 32-33). She also has pain in her neck that goes down her right arm. (Tr. 39).

Ms. Weischedel testified that she lived with her son. Her husband passed away in 2004. She had no income. She received food stamps and had just gotten her medical card back. (Tr. 18-19). When asked about her daily activities, she said that, on some days, she doesn't do anything except get something to eat and watch television. On other days, if she feels well enough, she goes outside and looks around, and does chores such as laundry. (Tr. 31). She testified that she likes to crochet and cook, but has difficulty now because of her hands. (Tr. 33).

She worked at McDonald's in September, 2008. She was bitten by a spider there. She was cooking on the grill. She "had to quit because of my hands were hurting so bad." (Tr. 40).

A vocational expert testified that, if plaintiff were able to do medium work with frequent manipulating and grasping with her hands, she would be able to do all of her past work. (Tr. 42). However, if she were limited to only occasional grasping and manipulating, she would not be able to do her past work, except for babysitting. (Tr. 43). The ALJ stated that he had doubts as to whether her babysitting qualified as substantial gainful activity. (Tr. 43).

The VE testified that there are no unskilled medium jobs that can be performed by a person who is limited to only occasional gripping, grasping and manipulating with the hands. (Tr. 43).

3.   **Medical Records**

Ms. Weischedel went to the emergency room at Fayette County Hospital on April 4, 2007, with a complaint of throbbing in her right hand, arm and shoulder. This had started a couple of months prior, and her symptoms were increasing. She was prescribed Darvocet and discharged. It was noted that she "does laundry at Vandalia Rehab." The impression was

musculoskeletal pain. She was to stay off work until April 9, 2007. (Tr. 318-21).

In September, 2008, she went to the emergency room with a cough. Her past medical history included depression. A chest x-ray showed COPD, negative for an acute process. The diagnoses were bronchitis and COPD. (Tr. 322-326).

Ms. Weischedel began seeing Dr. Mark Day at Southern Illinois Healthcare Foundation on November 11, 2008. She gave a past medical history of COPD, headache, chest pain, dizziness, anxiety and depression. Her chief complaint was trouble breathing and chest pains. She complained of shortness of breath and anxiety. (Tr. 380-381). On November 25, 2008, she complained of pain in her right chest and neck. She had headaches. Darvocet was prescribed. (Tr. 377). In December, 2008, she was taking Darvocet frequently and was having headaches almost daily. (Tr. 375). A CT scan of her head was normal. (Tr. 410).

Dr. Vidal Chapa did a consultative examination on December 11, 2008. Dr. Chapa noted a history of headaches, but also said she denied any history of "migraine-type of headaches." (Tr. 331). She said that she had COPD and used a Nebulizer machine 3 times a day. On examination, her lungs were clear to auscultation. Her heart rhythm was regular with no murmurs. Her hand grip was 5/5 on both sides and she could perform both fine and gross manipulations with both hands. Neurological examination was within normal limits. She had a full range of motion of her joints. (Tr. 331-339).

In January, 2009, Dr. Day noted that she had migraines and suggested a trial of Robaxin. He also noted that she had "OA" (osteoarthritis) in her hands. (Tr. 373).

On March 19, 2009, plaintiff went to the emergency room for pain in her left hand, thumb and finger. She was raking in the yard 2 days earlier. She woke the day before with pain. He left hand was swollen at the base of the thumb. An x-ray showed osteoarthritic changes. (Tr.

427-433).

On April 17, 2009, plaintiff complained to Dr. Day of wrist pain and swelling of her wrists and ankle. She also had GERD and anxiety. Her COPD was noted to be stable. (Tr. 367). In June, 2009, she again complained of frequent headaches. (Tr. 366).

Dr. Day's records contain a handwritten note dated June 9, 2009, which says "disability paperwork." (Tr. 365). There is also a typed, undated, unsigned note from Dr. Day which states that she was 56 years old and "may have some mild shortness of breath at times due to her mild obstructive lung disease." The note goes on to say that Dr. Day knows "of no other physical or mental impairment that may affect her ability to work except her mild lung disease and occasional headache." (Tr. 364). This note is located in Exhibit 8F, which is labeled "Office Treatment Records, dated 11/11/2008 to 6/9/2009, from Mark Day, M.D." See, Court Transcript Index, Doc. 15, Attachment 1. Thus, it appears that Dr. Day prepared his undated note on or around June 9, 2009.

Dr. Day's records include copies of various test results. On December 9, 2008, a treadmill stress test was done. The test was negative for exercise induced arrhythmia or ischemia, and the impression was "low exercise capacity." (Tr. 356). A chest x-ray on March 5, 2009, showed marked COPD with no acute process. (Tr. 407). Pulmonary function testing on the same date showed mild obstruction, normal lung volumes and mild diffusion abnormality. (Tr. 403). Plaintiff's left hand was x-rayed on March 19, 2009. This showed osteoarthritic changes at the base of the first metacarpal and at the DIP joints of the phalanges. (Tr. 402).

Ms. Weischedel continued to be treated by Dr. Day. The later records are located in Exhibits 12F and 14F, which are labeled as records from Fayette County Hospital. On July 2, 2009, she reported that her headaches were "much better." (Tr. 489). On August 6, 2009, she

complained of right sided pain and reported to Dr. Day that she had fainted the previous day and was out for 5 minutes.  He was concerned about the possibility of a TIA or a CVA, and ordered her admitted to the hospital for testing.  (Tr. 491).  A CT scan of the brain was normal.  (Tr. 514).  Examination of the carotid arteries showed mild plaque in the right carotid bulb and no significant plaque on the left.  (Tr. 518).  An MRI of the brain done on August 14, 2009, showed mild small vessel ischemic changes without acute intracranial process and no acute infarction.  (Tr. 522).

On September 4, 2009, plaintiff told Dr. Day that her hands were getting worse and it was hard to stand on her feet for very long.  Her hands were swelling and she was depressed.  He prescribed medications, including a refill of Paxil for depression.  (Tr. 494).  On September 29, 2009, she complained of migraines and crying a lot; she said her "whole body hurts."  Dr. Day switched her to Zoloft.  (Tr. 495).

Plaintiff went to the emergency room at Fayette County Hospital on October 11, 2009, complaining that she had woken up with neck pain.  On exam she had mild tenderness of her neck and he range of motion was limited.  An x-ray showed subluxation of C3 on C4, disc space narrowing and some facet arthropathy at C5-C6-C7, and neural foraminal encroachment at C5-6 and C607.  A soft cervical collar was applied, and she was prescribed Vicodin and Flexeril.  (Tr. 447-451).

Dr. Day saw her for neck pain on October 25, 2009, and prescribed physical therapy.  He noted that her depression was doing better on Zoloft, and her migraine medication was helping.  (Tr. 496).  Ms. Weischedel was evaluated for physical therapy for her neck pain on October 26, 2009.  She had neck pain which radiated down her right arm and down the middle of her back.  On examination, she had tenderness to palpation and limited range of motion of the cervical

spine. The therapist recommended that she have therapy 2 to 3 times a week for 3 to 4 weeks. Dr. Day approved this plan. (Tr. 452-453). Plaintiff was discharged from therapy on December 21, 2009. She did not attend all sessions and was not compliant with her home exercise program. (Tr. 459).

Plaintiff saw Dr. Day on October 27, 2009, for right ankle, foot, knee and hand problems. She had pain with movement of her thumbs. He ordered tests to investigate her joint pain, and noted that she was getting set up to see a psychiatrist. Her migraines continued the same. (Tr. 497).

Fayette County Hospital records contain an order from Dr. Day, dated October 27, 2009, for a number of tests to investigate whether plaintiff had a condition such as rheumatoid arthritis or lupus. (Tr. 461). These tests were done at Fayette County Hospital. Testing for antinuclear antibodies was negative. (Tr. 465-466).[3] An x-ray of the left wrist showed advanced osteoarthritis, adjacent soft tissue swelling, soft tissue calcification and osteopenia. (Tr. 469). An x-ray of the left hand showed osteoarthritis. (Tr. 467). An x-ray of the right wrist showed advanced osteoarthritis and osteopenia. (Tr. 470). An x-ray of the right hand showed moderate to severe osteoarthritis. (Tr. 468).

On November 17, 2009, Dr. Day ordered an MRI of the cervical spine, noting that plaintiff had right radicular symptoms. (Tr. 476, 498). On November 19, 2009, an MRI of the cervical spine showed degenerative changes at 3 levels, "most pronounced at C5-6 with mild to moderate foraminal compromise." (Tr. 475). Dr. Day noted on December 15, 2009, that there

---

[3]This blood work is part of the work-up to investigate the presence of autoimmune diseases such as lupus and rheumatoid arthritis. See, http://www.mayoclinic.com/health/ana-test/MY00787, accessed on May 3, 2012.

was no indication that she had rheumatoid arthritis, and that she probably had "mild OA." She complained of problems with her memory, depression and arthritis. (Tr. 581).

Ms. Weischedel received mental health counseling through the Community Resource Center beginning in November, 2009. (Tr. 556). On the first visit, she was disheveled and had a painful gait. Her affect was blunted and her mood was depressed. She was distractible. Her thought processes were normal and she had no hallucinations. Her short term memory was impaired. Her insight was poor. (Tr. 564). The diagnosis was major depressive disorder, recurrent. (Tr. 570). At the last session on February 17, 2010, she was doing better. She admitted to feeling depressed when she didn't have anything to distract herself with, and noted that she had been crocheting and house cleaning for her son. (Tr. 580).

4.   **RFC Assessment**

There is no state agency consultant RFC assessment in the transcript. In December, 2008, a state agency consultant reviewed records and determined that plaintiff did not have a severe impairment. (Tr. 340-342). In June, 2009, a second state agency consultant concurred in that opinion. This doctor relied, in part, on the undated note written by Dr. Day, referenced above. (Tr. 415-417).

## Analysis

For her first point, plaintiff takes issue with the ALJ's assessment of her RFC. Plaintiff argues that the ALJ ignored evidence favorable to her and failed to include all limitations that were established by the record.

Plaintiff is correct that the ALJ ignored the October, 2009, x-rays of her wrists and hands. These x-rays showed osteoarthritis in both hands and advanced osteoarthritis in both wrists, along with adjacent soft tissue swelling, soft tissue calcification and osteopenia in the left wrist.

(Tr. 467-470).

The ALJ's decision rested in large part on his perception that objective medical testing showed either normal results or only mild abnormalities. ALJ Hafer mentioned a chest x-ray which was "notable because it found no abnormalities." (Tr. 63). He mentioned a CT scan of the head, saying, "This objective test indicated normal results." (Tr. 64). He discussed pulmonary function testing and said he "assigned great weight to the findings that the claimant had normal total lung capacity and was found to have no more than mild obstruction." (Tr. 64). He discussed a cervical spine x-ray and concluded that it supported his RFC findings because it indicated that her back impairment was "non-disabling." (Tr. 64-65). He discussed a cervical MRI, calling it "objective evidence" which indicated "only mild to moderate abnormalities." (Tr. 65). However, when it came to Ms. Weischedel's complaints about her hands and fingers, he completely failed to mention the hand and wrist x-rays. Instead, he said, "There is nothing in the medical records to document the level of impairment alleged." (Tr. 65).

"The ALJ is not required to discuss every piece of evidence, but must build a logical bridge from evidence to conclusion." ***Vilano v. Astrue,*** **556 F.3d 558, 562 (7th Cir. 2009), and cases cited therein.** The ALJ cannot simply ignore a line of evidence that contradicts his conclusions. The ALJ must "confront evidence that does not support his conclusion and explain why it was rejected.*"* ***Indoranto v. Barnhart***, **374 F.3d 470, 474 (7th Cir. 2004).**

The Commissioner does not dispute that the ALJ completely failed to discuss the hand and wrist x-rays. He argues that those results, by themselves, do not "explain the severity" of plaintiff's condition. He goes on to argue that the ALJ relied upon Dr. Chapa's examination, which did not show any abnormality. The problem with this argument is, of course, that Dr. Chapa examined plaintiff some 10 months before the x-rays were taken. The fact that Dr. Chapa

did not find any limitation in the use of her hands in December, 2008, does not negate the fact that x-rays taken 10 months later showed significant arthritis.  More fundamentally, the ALJ's decision cannot be upheld based upon such after-the-fact rationalization.  **McClesky v. Astrue, 606 F.3d 351, 354 (7th Cir. 2010) (It is "improper for an agency's lawyer to defend its decision on a ground that the agency had not relied on in its decision....");  Parker v. Astrue, 597 F.3d 920, 922 (7th Cir. 2010).**  Since the ALJ ignored the x-ray results, his decision cannot be upheld based upon speculation as to how he might have reconciled the results with the rest of the evidence.

Similarly, the Commissioner argues that the ALJ's statements about the lack of objective evidence meant not that there was no objective evidence of any hand abnormalities, but that the objective evidence did not support the claim that the abnormalities were so severe as to be disabling.  Again, while this might be a plausible line of reasoning, it is not one which was espoused by the ALJ in his decision.  Thus, the Commissioner cannot rely on it to defend the decision.

Further, the ALJ assigned great weight to Dr. Day's note stating that the only impairments that might limit her ability to work were mild lung disease and occasional headaches.  He mentioned this note twice.  See, Tr. 64 & 66.  With regard to plaintiff's credibility, the ALJ said that this note was the "biggest inconsistency" between the evidence and plaintiff's claims. (Tr. 66).  However, this note was written in June, 2009, months before the x-rays of the hands and wrists, and before Dr. Day diagnosed osteoarthritis.  Again, the ALJ failed to reconcile the conflict between Dr. Day's note and the later x-rays and diagnosis.  The ALJ's error in ignoring the results of the hand and wrist x-rays therefore also impacted his credibility determination.

The Commissioner also points out that plaintiff claimed disability as of May 30, 2007, and did not mention arthritis in her hands in her application.  The significance of this observation is not readily apparent.  She was insured for DIB through September 30, 2011, and the prescribed period for DWB ended on November 30, 2011.  The x-rays of her wrists and hands were taken in October, 2009, well before those dates.  And, of course, since she applied for SSI as well, her condition up to the date of the decision was relevant.

In view of the vocational expert's testimony, the issue of whether Ms. Weischedel was limited in the use of her hands was crucial to the outcome of the case.  This is not to say that the x-ray results compel a finding that she was so limited.  However, the ALJ was not free to ignore the x-rays, which showed significant arthritis.

Because of the ALJ's errors, this case must be remanded.  The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Ms. Weischedel is disabled or that she should be awarded benefits.  On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

Plaintiff's Motion for Summary Judgment **(Doc. 17)** is **GRANTED**.

The Commissioner's final decision denying Rhea M. Weischedel's application for social security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of **42 U.S.C. §405(g).**

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATED:  May 4, 2012.**

s/ Clifford J. Proud
**CLIFFORD J. PROUD**
**United States Magistrate Judge**